# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF WYOMING



FILED

4:37 pm, 4/14/25

Tim J. Ellis
Clerk of Court

| | |
|---|---|
| In re:<br><br>BOTW HOLDINGS, LLC<br><br>   Debtor | Case No. 24-20138<br>Chapter 11 (Subchapter V) |
| In re:<br><br>HUSKEMAW OPTICS, LLC<br><br>   Debtor | Case No. 24-20141<br>Chapter 11 (Subchapter V) |
| In re:<br><br>BEST OF THE WEST<br>PRODUCTIONS, LLC<br><br>   Debtor | Case No. 24-20142<br>Chapter 11 (Subchapter V)<br><br>**Jointly Administered Under**<br>**Case No. 24-20138** |

**ORDER REGARDING CREDITOR JOHN A. MCCALL, JR.'S MOTION FOR AN ORDER COMPELLING DEBTORS TO CEASE PAYMENTS TO STRYK GROUP USA LLC UNLESS AND UNTIL AUTHORIZED BY THE COURT**

This matter is before the court on Creditor John A. McCall, Jr.'s Motion for An Order Compelling Debtors to Cease Payments to Stryk Group USA LLC Unless and Until Authorized by the Court[1] and Debtors' Objection[2]. The United States Trustee took no position on the Motion.[3] The court held an evidentiary hearing on February 18, 2025 and at the conclusion of the hearing, the court took the matter under advisement. After considering the pleadings, the evidence presented, and the arguments of the parties, the court denies the Motion.

**Background**

BOTW Holdings, LLC filed its petition for relief in this court on April 19, 2024. Huskemaw Optics, LLC filed its petition on April 21, 2024. Best of the West Productions, LLC filed its petition on April 22, 2024. These Debtors are Wyoming limited liability companies located in Cody, Wyoming. Their cases are being jointly administered under Case No. 24-20138 for procedural purposes under Fed. R. Bankr. P. 1015(b).[4]

---

[1]  ECF No. 207.
[2]  ECF No. 221.
[3]  ECF No. 234.
[4]  *See* ECF No. 13, Case No. 24-20138; ECF No. 12, Case No. 24-20141; ECF No. 12, Case No. 24-20142.

Debtor BOTW Holdings is the 100% owner and sole member of Huskemaw and Productions and operates as a holding company for its wholly owned subsidiaries. BOTW Holdings is also the 100% owner and sole member of non-debtors Best of the West Arms, LLC (Arms), Best of the West Ammo, LLC (Ammo), and Long Range Store, LLC (LRS), all Wyoming limited liability companies also based in Cody, Wyoming. Debtors, Arms, Ammo, and LRS shall be collectively referred to herein as the BOTW Entities.

John A. McCall, Jr. is a creditor of Debtors. Dr. McCall filed a proof of claim in each of Debtors' cases in the amount of $4,598,146.00, of which $2,751,656.00 was designated as a secured claim. The court previously deemed McCall's claims timely.

**Findings of Fact**

Charles (Chase) Myers was the sole witness at the hearing, and the court finds his testimony credible. Mr. Myers has over ten years of in the firearms industry; he began working for a boutique gun manufacturer while he was still in college. In 2020, Mr. Myers formed Stryk Group USA, LLC, a firearms industry consulting company based in Bozeman, Montana, with three others who had more experience in the industry than he did: Jeff Edwards, Jacob Herman, and Mike Bush. Mr. Edwards has done turnarounds at several companies in the firearms industry and Mr. Bush is an engineer. Stryk Group provides consulting services to various firearms businesses, and even provided services to Dr. McCall's company Stealth Vision in April of 2023.[5]

In or around August of 2023, Joseph and Christine Michaletz owned and controlled the BOTW Entities and sought out Stryk Group's services. BOTW Holdings and Stryk Group executed an Agreement, dated August 31, 2023, in which Stryk Group agreed to evaluate the current state of the business – specifically in the areas of talent/human resources, sales, marketing, operations, compliance and engineering, in exchange for a fee of $45,000 per month.[6] Mr. Myers executed the Agreement on behalf of Stryk Group, and Christine Michaletz signed it as BOTW Holdings' Chief Operating Officer. At the time, neither Stryk Group nor any of its members had any ownership interest in the BOTW Entities. Stryk Group placed three people on this engagement: Mr. Myers, Jeff Edwards, and Nick Ramberg.

When Stryk Group began providing its consulting services, Christine Michaletz was the individual responsible for compliance with the federal firearms license requirements at the business, performing various tasks in that role, including ensuring the accuracy of acquisition and disposition records, filling out any applicable forms for National Firearms Act transfers, making sure the

---

[5] The engagement with Stealth Vision terminated in July of 2023, called for payment of $20,000 per month, and was narrower in scope than the engagement before this court.

[6] Ex. D.

2

business had the proper variance approvals in place with vendors and other manufacturers that provided serialized parts, and ensuring the security of the facility, among other things. Christine Michaletz was also responsible (along with Laina Rajala) for the accounting and human resources functions of the business, including accounts payable, accounts receivable, invoicing, payroll, any disciplinary actions, benefits management, hiring, and firing.

Stryk Group identified areas in the day-to-day operations of the BOTW Entities that could be improved: the BOTW Entities lacked any in-house engineering talent, and improvements were needed in the areas of compliance and manufacturing. Stryk Group also concluded the BOTW Entities did not have the necessary personnel in place to address the operational issues Stryk Group had identified. Around the time of the Agreement, the BOTW Entities terminated the individuals in charge of sales, marketing, and production, and terminated the only individual who performed engineering functions. Shortly thereafter, in or around December of 2023, the Michaletzes approached Mr. Myers and Mr. Edwards about acquiring the BOTW Entities. Mr. Myers testified he thought the Michaletzes wanted to divest themselves of their interests in the BOTW Entities because they had invested in them significantly but were continuing lose money. They were also fatigued of ongoing litigation with Dr. McCall.

On March 8, 2024, Stryk Group Holdings LLC (Stryk Holdings) acquired a majority (67%) membership interest in BOTW Holdings from the Michaletz Revocable Trust for the sum of one dollar.[7] Stryk Group owns 100% of Stryk Holdings. Jeff Edwards owns a 73% membership interest, and Mr. Myers has a 27% interest, in Stryk Group.[8]

Upon their acquisition, Mr. Myers became the Chief Operating Officer (COO) and Manager of BOTW Holdings, the BOTW Entities, and Stryk Holdings. Mr. Myers did not, however, become an employee of BOTW Holdings, nor did he become an employee of any of the BOTW Entities – and neither did Mr. Edwards. Mr. Edwards was (and is) the Manager of Stryk Group.

In his role as COO and Manager of BOTW Holdings, Mr. Myers did not have an expectation BOTW Holdings would compensate Stryk Holdings, because Stryk Holdings owned or was the majority owner of the BOTW Entities. Mr. Myers has not received any compensation from Stryk Holdings for his management of that entity, nor has he received any compensation from BOTW Holdings or from any of the BOTW Entities for his management of those entities.

---

[7] Ex. B, Membership Interest Purchase Agreement. The liabilities schedule was missing from the document. *See also*, Ex. G, Statement of Financial Affairs for BOTW Holdings, Line 28.

[8] Ex. G, Line 28, indicating the relative percentages of Mr. Edwards' and Mr. Myers' ownership interests, respectively, in Stryk Holdings. Mr. Myers explained this ownership was through Stryk Group, which owns 100% of Stryk Holdings.

Once the acquisition closed, the Michaletzes were unwilling to stay involved in the business. According to Mr. Myers, they turned in their keys and wished them the best. When the Michaletzes departed, there was no employee handling the talent/human resources functions; there was no financial person or persons; there was no compliance person. The heads of sales and marketing had been terminated, some of the manufacturing staff had been terminated, and there were a number of vacancies. After the acquisition, Mr. Myers' immediate and primary concern as the Manager of the BOTW Entities was to fill the personnel gaps to attempt to turn the business into a profitable going concern. Mr. Myers expressed concern about the financial impact on the BOTW Entities if he did not obtain personnel to address day-to-day operations. The new owners of the business also expected the BOTW Entities would need to address their financial obligations, including the claims of Dr. McCall and FirstBank. They believed the BOTW Entities could address these obligations without having to resort to a bankruptcy filing, however.

On March 11, 2024, three days after acquisition, BOTW Holdings and Stryk Group entered into a new Agreement for Stryk Group to provide services in eight areas – talent and human resources, finance, sales and business development, marketing, e-commerce, operations, compliance, and engineering – in exchange for a monthly fee of $50,000, which could be terminated by either party with sixty (60) days' notice.[9] Mr. Myers acknowledged there was no request for proposals to consider alternatives other than hiring Stryk Group. He testified the $50,000 per month figure was the bare minimum necessary for Stryk Group to cover the cost of the services identified. The monthly fee was higher than the fee under the August 23, 2023 Agreement because this second Agreement required Stryk Group to dedicate more time and resources by providing personnel for services, not just identifying areas for improvement.

Under this Agreement, there are there no particular performance requirements that Stryk Group has to meet, other than performing the tasks in the areas identified in the Agreement. Mr. Myers signed the Agreement for BOTW Holdings as COO and Mr. Edwards signed as Manager of Stryk Group. Although the Agreement was executed about a month before the bankruptcy cases, Mr. Myers testified it was not executed in contemplation of BOTW Holdings' bankruptcy.

Approximately a dozen individuals carry out the services identified in this second Agreement. They are not employed by Stryk Group, however; Stryk Group does not have any employees. Rather, they are employed by another subsidiary of Stryk Group, Yellowstone Natural Holdings Company (Yellowstone), whose offices are located in the same building as Stryk Group's. Under the Agreement, Stryk Group did not need BOTW Holdings' approval to outsource the work to Yellowstone. Although the personnel supplied under the Agreement provide services in many

---

[9] Ex. A.

4

aspects of the business, there are still approximately a dozen full-time employees of the BOTW Entities located in Cody, Wyoming who work in the areas of customer service, manufacturing, and quality control. Payroll for these BOTW employees is reflected in the Monthly Operating Reports (MORs).

Mr. Myers testified as to the services Stryk Group provides and the individuals involved. Under the Agreement, Stryk Group provides human resources and finance services to the BOTW Entities, which includes finding prospective employees, disciplinary actions, payroll, benefits administration, invoicing, accounts receivable, collections, accounts payable, and purchasing. Prior to Stryk Holdings' acquisition, Christine Michaletz and Laina Rajala were responsible for such tasks. Under the Agreement, Ms. Sullivan and Ms. Brown are now tasked with those duties. Mr. Myers testified if Ms. Brown and Ms. Sullivan did not perform these tasks, bills would go unpaid, invoicing would go undone, employees' benefits would not be administered or administered improperly, and payroll would not get paid.

Stryk Group also provides marketing services under the Agreement, including digital and traditional marketing and ecommerce. Tasks within this area include social media, graphic design, website development, website fixes, addition and deletion of products, increasing brand awareness, marketing campaigns, trade shows, [10] placing ads in publications, and similar tasks. Stryk Group supplies two people who mainly perform marketing functions.[11] Before the acquisition, this was one of the areas in which Stryk Group identified a void leading to the marketing director being terminated. Mr. Myers testified if marketing is neglected, it has a negative impact on brand and product awareness, which would in turn negatively impacts revenue.

Stryk Group also provides sales services under the Agreement, involving outreach to potential or existing customers to continue to drive revenue. One person[12] is currently tasked with sales functions. Before Stryk Holdings' acquisition, the director of sales of the BOTW Entities and one other salesperson had been terminated. If sales services are not performed, the business will not generate revenue.

When Stryk Group took over the compliance tasks with respect to the federal firearms license (held by non-debtor Arms), it had to perform the daily tasks Christine Michaletz previously

---

[10] There is currently some heated litigation pending in Texas state court filed by Dr. McCall and his company, Stealth Vision LLC, against Arms and Stryk Group, relating at least in part to Stryk Group's involvement in some of the marketing for trade shows. The lawsuit alleges a number of things, including a trademark violation, conversion of personal property, breach of contract, and fraudulent inducement. The Texas state court has issued a temporary restraining order. The existence of this litigation and the temporary restraining order are not relevant to the matter the court must decide herein.

[11] Jared Byerly and Brooke Reck.

[12] Andy Moeckel.

5

performed. Mr. Myers is currently tasked with these duties. If the business ceases to comply with rules and regulations provided by federal law, it risks losing its federal firearms license, which means it would not be able to transact business. The functions and duties within compliance have nothing to do with the bankruptcy cases; they are tasks that must be performed to conduct business in the firearms industry.

As the Manager and COO of the BOTW Entities and Stryk Holdings, Mr. Myers is involved with the administration of the bankruptcy cases. But he wears different hats: Mr. Myers also addresses compliance issues on a daily basis in his capacity as a representative for Stryk Group, and Yellowstone pays him for these compliance services.

Stryk Group also provides mechanical, industrial, and manufacturing services, which include engineering the products for safe and proper function, attention to the products' design and appearance, and putting processes in place to ensure a high level of quality and consistency throughout the manufacturing process. Before Stryk Holdings acquired BOTW Holdings there was one person involved in engineering who was terminated, and so again, there was a void in this area. One person[13] is currently tasked with engineering functions under the Agreement. Without these services, quality control would disappear, which would in turn negatively affect public perception of the products and result in more returns of product and lost revenue.

Stryk Group also handles operations, using software to do everything from keeping track of inventory to keeping track of all of the accounting functions within the business. Operations also includes manufacturing consulting services and logistics, which involve streamlining and improving ways to ship product, receive product, and how the product moves through the building.

Mr. Myers supervises all of the personnel providing services under the Agreement in his capacity as COO and Manager of the BOTW Entities. He testified the personnel providing services under the Agreement lack discretion or authority to make decisions on the BOTW Entities' behalf without his approval. With the limited exception of Ms. Sullivan, who spends about an hour or less each month preparing the MORs, none of these personnel are involved in the administration of the bankruptcy cases, none of them have any control over the bankruptcy cases, and none of them were involved in helping to draft the plan Debtors filed. Rather, they are all involved in the necessary day-to-day operations of the BOTW Entities, and if they left they would need to be replaced, or the business would suffer negative impacts. Mr. Myers estimates the cost to replace such individuals would be around $300,000 per year for Ms. Sullivan and Ms. Brown,[14] about $100,000 to $200,000 to replace the two individuals performing the marketing functions, between $150,000 to $200,000,

---

[13] Ryan Chipetski.
[14] Mr. Myers testified it would cost the BOTW Entities upwards of $100,000 per year to replace Ms. Sullivan, and around $200,000 per year to replace Ms. Brown, who is a certified public accountant.

plus commission, to replace the salesperson,[15] and upwards of $100,000 or more per year to replace the engineering person. If the compliance services are not provided, the BOTW Entities would also need to find somebody else to fill those shoes, at a cost of anywhere from $75,000 to $85,000 per year.

The monthly fee to Stryk Group under the Agreement has not increased since it was executed, and there was no evidence to contradict Mr. Myers' testimony that the cost of the services being provided was reasonable and below-market. Mr. Myers testified the personnel provided by Stryk Group (through Yellowstone) are highly skilled, educated, and competent individuals in their fields, and given the prevailing status of the bankruptcies and litigation the BOTW Entities have been embroiled in, it would be exceedingly difficult to find people to replace these individuals. He also indicated the business was struggling to hang onto the employees in Cody.

Within the ninety days prior to the Petition Date, BOTW Holdings had paid a total of $135,000 in fees to Stryk Group.[16] Post-petition, BOTW Holdings has paid a total $480,000 to Stryk Group under the second Agreement (through January 2025, with another anticipated payment of $50,000 to be made in February 2025).[17] Attachments to the MORs filed by BOTW Holdings for the months of April 2024 through December 2024 describe the payments to Stryk Group as "Professional fees."[18]

BOTW Holdings does not provide any services to customers, nor does it sell any merchandise; it is a holding company that does business through – and derives its revenue strictly from – its operating subsidiaries (Huskemaw, Ammo, and Arms). Since BOTW Holdings' bankruptcy case was filed, Mr. Myers testified over $500,000 has been transferred to BOTW Holdings from non-debtor Arms, and a little under $80,000 has been transferred to BOTW Holdings from non-debtor Ammo. The funds received from Arms and Ammo are used at least in part to pay for the services Stryk Group provided.

At the hearing, Debtors' five-year projections submitted in connection with the recently filed Chapter 11 plan were also discussed.[19] One of the line items is "professional fees," estimated to be $600,000 a year; those are the payments to Stryk Group. Mr. Myers does not expect that amount

---

[15] Mr. Myers described the salesperson as virtually irreplaceable due to the depth of his relationships within the industry that allows him to be more effective than most.
[16] See ECF No. 83, Holdings' Statement of Financial Affairs, p. 15 of 20, §3.6.
[17] Ex. C (Stryk Group invoices); Exs. H-L, N, and P-R (MORs for April through December 2024).
[18] Holdings paid Stryk Group $45,000 per month in April, May, Jun and July of 2024 totaling $180,000, and $50,000 per month in August, September, October, November, and December 2024, totaling an additional $250,000. The payments were $5,000 less during the months of April through July 2024 due to an oversight. As of the hearing, BOTW Holdings had made the January 2025 payment of $50,000, but the February 2025 payment had not yet been made. *See* Exs. H-L, N, P-R.
[19] Ex. T.

will increase over the next five years. There is also a line item to address Dr. McCall's claim. Debtors project payments to Dr. McCall of roughly $2.7 million over the life of the proposed plan.

**Positions of the Parties**

Dr. McCall does not dispute these services are necessary. He does not dispute BOTW Holdings would need to replace these individuals if Stryk Group were not providing the personnel, nor does he dispute the potential increased cost to replace these individuals. Instead, Dr. McCall contends Stryk Group, an insider, is a "professional" within the meaning of Section 327 of the Bankruptcy Code,[20] and payments made to it under the Agreement have not been authorized by the court or the Bankruptcy Code. Dr. McCall asserts the Agreement was entered into outside of the ordinary course of business, in anticipation of filing bankruptcy. He also asserts the Agreement was not negotiated at arm's length – it contains no performance requirements, no required deliverables, no benchmarks of any kind, no oversight, no comparable bids, and no consideration of the fact the prior management team, the Michaletzes, provided the same services for free. Dr. McCall asserts it is an insider deal made for the purpose of looting Debtors' assets to deprive Dr. McCall the value of his secured interest in Debtors' collateral.

Debtors assert the personnel provided by Stryk Group under the Agreement are not "professionals," and therefore, no court approval is required under Section 327. By its own terms, Section 327 does not apply to entities (professional or not) whose services have no connection to a debtor's duties under the Code. As a result, Debtors contend no court approval is required for a debtor to employ and compensate a professional whose services are limited to day-to-day business operations, which are precisely the services being provided by Stryk Group. Debtors assert the services being provided under the Agreement are ordinary course, related to Debtors' continued operations, and do not involve administration of the estate.

**Discussion**

    I.    Professional

As to whether Stryk Group is a "professional," such term is not defined in the Bankruptcy Code. Section 327 provides "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."[21]

Stryk Group and the personnel provided are highly skilled, educated, and competent individuals in their fields, and would seemingly qualify as "other professional persons." However,

---

[20] All references to the Bankruptcy Code are to 11 U.S.C. § 101 *et seq.*
[21] 11 U.S.C. § 327(a).

8

under the majority view, the term "other professional persons" as used in Section 327(a) has been interpreted to mean "those 'who play[ ] a central role in the administration of the debtor's estate.' "[22] "To hold otherwise opens the door to unnecessary court involvement in potentially absurd hiring situations. For example, if [a] broad definition had been legislatively intended, the whole spectrum of known specialty occupations from sanitation engineer to the company physician easily could become the subject of retention orders."[23] Again, notwithstanding how the fees paid to Stryk Group in the MORs and Debtors' projections are labeled, the unrefuted testimony was the services being provided by Stryk Group are not being provided solely because BOTW Holdings and some of the BOTW Entities are in bankruptcy; with or without the bankruptcy cases, these same services would need to be provided on a daily basis to maintain business operations.

Dr. McCall urges this court to review the six factors set forth by the United States District Court for the District of Delaware in *In re First Merchants Acceptance Corp*. He contends all of the factors support a finding Stryk Group and the personnel provided under the Agreement are "professionals" within the meaning of Section 327. Those factors are:

> (1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization, (2) whether the employee is involved in negotiating the terms of a Plan of Reorganization, (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations; (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate, i.e. the qualitative approach, (5) the extent of the employee's involvement in the administration of the debtor's estate, i.e. the quantitative approach; and (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.[24]

In applying these factors, "no one factor is dispositive and [t]he factors should be weighed against each other and considered in toto."[25]

Upon considering the *First Merchants Acceptance Corp*. factors here, the court concludes Stryk Group and the personnel provided (through Yellowstone) are not "professional persons" under Section 327. While their services involve some degree of specialized knowledge or skill, none of them is involved in negotiating Debtor's plan nor do any of them have any control over the bankruptcy cases, except for Mr. Myers – and in doing so, he is acting in his capacity as the Manager and COO of Debtors, not as the person handling compliance issues under the Agreement

---

[22] *In re Blair Oil Invs., LLC*, 588 B.R. 579, 593 (Bankr. D. Colo. 2018) (quoting *In re Neidig Corp.*, 117 B.R. 625, 628 (Bankr. D. Colo. 1990) (quoting *Matter of Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981)).
[23] *In re Johns-Manville Corp.*, 60 B.R. 612, 620 (Bankr. S.D.N.Y. 1986).
[24] *In re First Merchants Acceptance Corp.*, No. 97-1500 JJF, 1997 WL 873551, at *3 (D. Del. Dec. 15, 1997).
[25] *In re First Merchants Acceptance Corp.*, 1997 WL 873551, at *3.

or as the minority interest owner of Stryk Group. The services being provided under the Agreement, other than roughly an hour per month of Ms. Brown's time in preparing the MORs, are wholly unrelated to the bankruptcy cases; their work is the routine maintenance of the BOTW Entities' business operations.

The most important factor under *First Merchants Acceptance Corp.* is the amount of discretion afforded the party:

> While a few courts seem to focus upon whether or not the work performed is largely ministerial . . . and others look to the debtor's past history of employing the type of person in question and whether other companies similarly situated routinely employ such persons . . . perhaps the most common determinative factor appears to be the amount of autonomy or discretion the person is given by the debtor or trustee in performing its services.[26]

The court finds the unrefuted evidence was that the personnel under the Agreement are directly supervised by Mr. Myers, who is the Manager and COO of the BOTW Entities. He credibly testified the personnel providing services under the Agreement lack discretion or authority to make decisions on behalf of the BOTW Entities without his approval. While the personnel provided under the Agreement deal with the day-to-day operations of the business – and this necessarily entails dealing with Debtors' assets on some level – they do not exercise significant control nor do they have the requisite autonomy to be considered "professional persons," in this court's view.[27]

II.   Ordinary Course

The Bankruptcy Code provides a debtor-in-possession, standing in the shoes of the trustee, may continue to operate its business, unless the court orders otherwise.[28] And under Section 363, transactions or uses of property in the ordinary course are permissible without notice or hearing, unless the court orders otherwise.[29]

Dr. McCall contends the Agreement with Stryk Group is not in the ordinary course because it differs from past practices, under which the Michaletzes performed many of the same services for

---

[26] *Id*. (finding consultant's "unbridled discretion" weighed in favor of a finding it was a "professional" under Section 327.) *See also, In re Neidig Corp.*, 117 B.R. at 628–29 (citing *In re Rusty Jones, Inc.,* 109 B.R. 838, 844 (Bankr. N.D. Ill. 1989) (the person made virtually all management decisions) and other cases, including *In re Century Investment Fund VII Limited Partnership,* 96 B.R. 884 (Bankr. E.D. Wis. 1989) and *In re Park Avenue Partners Limited Partnership,* 95 B.R. 605 (Bankr. E.D. Wis. 1988). Both of these cases "involved replacement apartment managers who performed the day-to-day rental and maintenance duties necessary regardless of whether or not a bankruptcy is filed. Neither manager had the power to set rents, incur expenditures over a certain level or make long-range decisions. The trustees, or debtors-in-possession, retained a strong and direct hand in operations." *Id*.
[27] *See In re Brookstone Holdings Corp.*, 592 B.R. 27, 35 (Bankr. D. Del. 2018) ("So while it is true that Hilco is certainly providing services in connection with an important sale process, the record does not support a finding that Hilco 'controls' or 'manages' that process.").
[28] 11 U.S.C. §§ 1107(a), 1108.
[29] 11 U.S.C. § 363(c)(1).

free. There was insufficient evidence presented to the court to support this assertion. The evidence presented to the court showed the services being provided under the Agreement were not previously provided for free; around the time of the first Agreement in August of 2023, the Michaletzes terminated the individuals in charge of sales, marketing, and production, and they also terminated the only individual who performed engineering functions. The evidence presented also shows that all of the services being provided are necessary, daily tasks required to be performed to keep any business within the firearms industry running, and the amounts being charged under the Agreement to do so are below-market rate. The court finds an expectation a business will be kept running by paying nothing to the personnel performing critical daily tasks to keep it running is not a reasonable expectation for any creditor to have. "[T]he touchstone of 'ordinariness' is ... the interested parties' *reasonable expectations* of what transactions the debtor in possession is likely to enter in the course of its business."[30]

Dr. McCall also alleges because Mr. Myers and Mr. Edwards both executed the Agreement – on behalf of the BOTW Holdings and Stryk Group, respectively – and it was not subject to competitive bids, it was not an arms-length transaction. While Stryk Group is admittedly an insider of Debtor and both owners of Stryk Group signed the Agreement – with Mr. Myers signing as the Manager and COO of BOTW Holdings and not in his capacity as a minority owner of Stryk Group – the evidence was the prior managers of BOTW Holdings had entered into an Agreement with Stryk Group several months before, and such agreement is commensurate with the agreement Dr. McCall's own company entered into – just larger in scope. There is no evidence before the court to suggest this first Agreement was not entered into at arms-length; at the time the first Agreement was entered into, neither Stryk Group, Stryk Holdings, Jeff Edwards, or Mr. Myers had any stake in the business. Stryk Group's subsidiary acquired the business from the Michaletz Trust at a time when a number of operational issues, including big gaps in staffing, had been identified by Stryk Group and the Michaletzes desired to divest themselves of the business. Stryk Group previously provided ordinary course services to Debtors prior to the acquisition. The current Agreement is an extension of this arrangement, albeit broader in scope.

While the timing of the Agreement was shortly before Debtors' bankruptcy filings such that the services being provided by Stryk Group under the Agreement were not performed for very long, prepetition activities of a debtor "provide only the starting point" to an ordinary course analysis.[31] The evidence showed that around the time Stryk Group became involved, the Michaletzes had

---

[30] *In re Johns-Manville Corp.*, 60 B.R. at 616 (quoting *In re James A. Phillips, Inc.,* 29 B.R. 391, 394 (S.D.N.Y. 1983)).
[31] *Id.* at 617.

11

terminated a number of people who had provided such services to the BOTW Entities. The business needed to take immediate and corrective action to fill the staffing voids identified by Stryk Group under the first Agreement, in order for the business to continue to operate and become profitable. The services themselves are in the ordinary course; the unrefuted testimony of Mr. Myers was that all of the functions provided were day-to-day operations of the business; with or without any bankruptcy filings, these services would need to be performed to maintain such a business within the industry. "The 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate."[32]

Nor does the court find there was any evidence presented that Debtors are simply "shoveling $50,000 out the door" every month without receiving the services contracted for; to the contrary, the evidence was various individuals actually perform the services identified in the Agreement, and even if they were to cease providing such services, the business would need to replace them to continue operating. Again, the evidence presented to the court was that all of the services being provided under the Agreement are necessary, daily tasks required to be performed to keep any business within the firearms industry running, and the amounts being charged to do so under the Agreement are reasonable.

Accordingly, it is

ORDERED the Motion is denied. A separate order and judgment shall enter.

BY THE COURT

*Cathleen D. Parker* 4/14/2025

Honorable Cathleen D. Parker
United States Bankruptcy Court
District of Wyoming

Service to:
    Clark Stith
    Brad Hunsicker

---

[32] *Id.*